No. 25-1078

**United States Court of Appeals
For the First Circuit**

_____

LYNNEL COX, as administrator of the Estate of Shayne R. Stilphen,

Plaintiff-Appellant,

v.

ISMAEL ALMEIDA; PAUL MICHAEL BERTOCCHI; CATIA FREIRE;
BRIAN PICARELLO,

Defendants-Appellees,

BOSTON POLICE DEPARTMENT; JOHN/JANE DOES 1-2; DAVID
MARSHALL; CITY OF BOSTON,

Defendants.

_____

On Appeal from the United States District Court for the District of Massachusetts
in Civil Action No. 1:22-cv-11009-RGS

_____

**BRIEF OF DEFENDANTS-APPELLEES ISMAEL ALMEIDA, PAUL
MICHAEL BERTOCCHI, CATIA FREIRE, AND BRIAN PICARELLO**

_____

Dated: August 29, 2025                    *Counsel Listed Inside Front Cover*

Counsel for Defendants-Appellees
**ISMAEL ALMEIDA,
PAULMICHAEL BERTOCCHI,
CATIA FREIRE, AND BRIAN
PICARELLO**

Edward F. Whitesell, Jr.
First Circuit Bar No. 1122127
Senior Assistant Corporation Counsel

Randall F. Maas
First Circuit Bar No. 1204232
Senior Assistant Corporation Counsel

City of Boston Law Department
One City Hall Square, Room 615
Boston, MA 02201
(617) 635-4034
edward.whitesell@boston.gov
randall.maas@boston.gov

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ................................................................................ 1

STATEMENT OF THE ISSUES ........................................................ 5

STATEMENT OF THE CASE ............................................................ 6

   I.   PROCEDURAL HISTORY. ....................................................... 6

   II.  FACTS. .......................................................................................... 8

     The defendant officers. .................................................................. 8

     Stilphen is arrested on July 14, 2019,
     and brought back to the police station. ......................................... 9

     Stilphen is booked. ...................................................................... 11

     After being placed in his cell, Stilphen removes drugs from his shorts
     and ingests them surreptitiously over the next two hours. ............... 12

     Between 2:35 AM and 4:48 AM, Stilphen alternates between
     sitting upright and leaning forward with his body bent over his waist. ........... 14

     The D-4 station becomes the site of an investigation after
     Joseph Perry suffers a fatal injury. ...................................................... 16

     Officers conduct cell checks after 4:48 AM. ..................................... 17

     Officers attempt to resuscitate Stilphen
     after he is discovered unresponsive. ................................................... 18

     Plaintiff's medical expert testified that
     Stilphen began to suffer an overdose at 4:48 AM. ............................ 20

     The District Court indicated that it would enter a judgment
     in favor of at least two of the defendant officers. .............................. 20

SUMMARY OF THE ARGUMENT ...................................................... 21

i

ARGUMENT ...................................................................................................24

I.   *Kingsley* does not apply to Plaintiff's denial of medical
care claims against the defendant officers. ...........................................24

II.   Even if *Miranda-Rivera* did not rule on the applicability
of *Kingsley* to denial of medical care claims, the defendant officers
are entitled to qualified immunity..........................................................47

III.   The District Court's instructions were not prejudicial
to Plaintiff's claims against at least two of the defendant officers.......................50

CONCLUSION ...............................................................................................55

CERTIFICATE OF COMPLIANCE......................................................................56

CERTIFICATE OF SERVICE ............................................................................57

# TABLE OF AUTHORITIES

### CASES

*Agostini v. Felton*,
   521 U.S. 203 (1997)...................................................................................... 32, 44

*Alderson v. Concordia Parish Corr. Facility*,
   848 F.3d 415 (5th Cir. 2017) ...................................................................41

*Alfano v. Lynch*,
   847 F.3d 71 (1st Cir. 2017)......................................................................48

*Anderson v. Creighton*,
   483 U.S. 635 (1987)..................................................................................48

*Bell v. Wolfish*,
   441 U.S. 520 (1979)......................................................... 26, 27, 30, 31, 43, 45

*Boston, C.C. & N.Y. Canal Co. v. Seaboard Transp. Co.*,
   270 F. 525 (1st Cir. 1921).........................................................................53

*Brawner v. Scott County*,
   14 F.4th 585 (6th Cir. 2021) .......................................................... 45, 49

*Castro v. Cty. of Los Angeles*,
   833 F.3d 1060 (9th Cir. 2016) .................................................................36

*City of Tahlequah, Oklahoma v. Bond*,
   595 U.S. 9 (2021)......................................................................................48

*Colbruno v. Kessler*,
   928 F.3d 1155 (10th Cir. 2019) ..............................................................44

*Conlogue v. Hamilton,*
906 F.3d 150 (1st Cir. 2018)................................................................48

*County of Sacramento v. Lewis,*
523 U.S. 833 (1998)........................................................ 5, 25, 32, 36

*Dang ex rel. Dang v. Sheriff, Seminole Cnty.,*
871 F.3d 1272 (11th Cir. 2017) ................................................... 41, 42

*Daniels v. Williams,*
474 U.S. 327 (1986)........................................................................36

*Edwards v. Gilbert,*
867 F.2d 1271 (11th Cir. 1989) ..........................................................47

*Elliott v. Cheshire County,*
940 F.2d 7 (1st Cir. 1991)........................................................... 46, 47

*Estelle v. Gamble,*
429 U.S. 97 (1976).................................................................. 35, 37, 43

*Farmer v. Brennan,*
511 U.S. 825 (1994).......................................... 30, 38, 40, 43, 49, 50

*Gaudreault v. Municipality of Salem,*
923 F.2d 203 (1st Cir. 1990)...............................................................51

*Gordon v. Cnty. of Orange,*
888 F.3d 1118 (9th Cir. 2018) ...........................................................35

*Gordon v. Kidd,*
971 F.2d 1087 (4th Cir. 1992) ...........................................................46

*Graham v. Connor,*
490 U.S. 386 (1989)................................................................ 25, 26, 28

iv

*Helphenstine v. Lewis County*,
   60 F.4th 305 (6th Cir. 2023) ..................................................49

*Hudson v. McMillian*,
   503 U.S. 1 (1992)...................................................... 27, 34

*Kenjoh Outdoor, LLC v. Marchbanks*,
   23 F.4th 686 (6th Cir. 2022) ..................................................49

*Kimbrough v. United States*,
   552 U.S. 85 (2007)..................................................... 29, 30

*Kingsley v. Hendrickson*,
   576 U.S. 389 (2015)............................... 3-7, 21-31, 34, 36-45, 47, 49

*Lara-Grimaldi v. County of Putnam*,
   132 F.4th 614 (2d Cir. 2025) ..................................................34

*Lawler ex rel. Lawler v. Hardeman County*,
   93 F.4th 919 (6th Cir. 2024) ............................................. 23, 49, 50

*Malley v. Briggs*,
   475 U.S. 335 (1986)..........................................................48

*McKenney v. Mangino*,
   873 F.3d 75 (1st Cir. 2017)...................................................48

*Miranda v. Cnty. of Lake*,
   900 F.3d 335 (7th Cir. 2018) .................................................35

*Miranda-Rivera v. Toledo-Davila*,
   813 F.3d 64 (1st Cir. 2016)...........................3, 7, 22, 37-43, 47, 49, 50

*Monell v. Department of Social Services of City of New York*,
   436 U.S. 658 (1978)...................................................................................6

*Moore v. Luffey*,
   767 Fed. Appx. 335 (3d. Cir. 2019)........................................................42

*R.A.V. v. City of St. Paul, Minn.*,
   505 U.S. 377 (1992)........................................................................ 32, 44

*Rodriguez de Quiejas v. Shearson/ Am. Express, Inc.*,
   490 U.S. 477 (1989)................................................................................32

*San Juan Cable LLC v. P.R. Tel. Co.*,
   612 F.3d 25 (1st Cir. 2010)....................................................................39

*Short v. Hartman*,
   87 F.4th 593 (4th Cir. 2023) ................................................23, 45-47, 49

*Strain v. Regalado*,
   977 F.3d 984 (10th Cir. 2020) ...........................................22, 36, 42-44

*Trozzi v. Lake County, Ohio*,
   29 F.4th 745 (6th Cir. 2022) ..................................................................45

*United States v. Perez*,
   89 F.4th 247 (1st Cir. 2023)...................................................................39

*United States v. Rodriguez*,
   527 F.3d 221 (1st Cir. 2008),........................................................... 30, 39

*Webster v. Fall*,
   266 U.S. 507 (1925)........................................................................ 40, 41

*Whitney v. City of St. Louis*,
   887 F.3d 857 (8th Cir. 2018) ........................................................ 41, 42

vi

*Wilson v. Seiter*,
  501 U.S. 294 (1991).......................................................................... 30, 31

*Zingg v. Groblewski*,
  907 F.3d 630 (1st Cir. 2018)....................................7, 22, 37-39, 43, 50

**STATUTES**

42 U.S.C. § 1983 ....................................................................................6, 35

**OTHER AUTHORITIES**

*Black's Law Dictionary* (11th ed. 2019) ...................................................43

# **INTRODUCTION**

The events of this case took place over the course of a few hours on the early morning of July 14, 2019. The decedent, Shayne Stilphen, was arrested at around 1:00 AM on suspicion of breaking and entering into a motor vehicle. He was brought back to the D-4 police station in Boston's South End at around 1:30 AM. After spending time in a group holding cell and being booked, Stilphen was placed in an individual cell at 2:21 AM. Officers conducted regular checks of the cell block throughout the morning. At 5:51 AM, officers discovered Stilphen unresponsive in his cell; they administered CPR and Narcan, but to no avail.

This is not a case in which officers turned a blind eye to an inmate's medical emergency, which is why the jury returned a verdict in favor of all four officers. Rather, the evidence indicates that Stilphen's death resulted from a confluence of tragic circumstances.

Specifically, surveillance video shows that minutes after he was placed in his individual cell, Stilphen removed a small baggie he had smuggled into the police station by hiding it inside his underwear. A chemical analysis of this baggie revealed that it contained a mixture of drugs that included fentanyl. Over the next two hours, Stilphen periodically ingested these drugs, and he did so in a manner that worked against the safety protocols at the police station. Surveillance video shows that Stilphen was aware when officers were in the cell block conducting cell

checks, that he would hide the drugs both from the officers and the surveillance camera mounted in the corner of his cell, and that he would consume drugs when officers were not in the cell block.

According to Plaintiff's own medical expert, Stilphen did not reach the point of overdose until 4:48 AM, more than three hours after he first arrived at the police station and more than two hours after he was placed in his cell. Plaintiff's medical expert observed that prior to 4:48 AM, Stilphen moved around in his cell and responded to stimuli. This observation was confirmed by the defendant officers, who testified that Stilphen engaged in coherent conversation, answered all of the questions posed to him during booking, and consistently awoke from a sleeping state when there was a noise or when officers would gently touch him. Plaintiff's medical expert further testified that prior to his overdose at 4:48 AM, the main medical intervention that Stilphen required was monitoring. Stilphen received this intervention in the form of officers' regular checks of the cell block.

Given the testimony of Plaintiff's medical expert, this case boils down to the approximately hour-long period between 4:48 AM and 5:51 AM in which Stilphen was experiencing an overdose but officers were unaware of it. But the jury had good reason to rule in favor of the defendant officers, including the two officers who were responsible for checking on prisoners in the cell block during this critical time window. Specifically, Stilphen's overdose took place in the aftermath of

2

another major incident at the D-4 station that morning, involving a prisoner named Joseph Perry. When he was brought back to the D-4 wagon bay after being arrested for sexual assault, Perry refused to come out of the wagon, and instead slammed his head on a metal bar, causing massive bleeding. Perry was taken to a hospital where he would later die. The wagon bay became a crime scene, the site of a homicide investigation. EMTs, crime scene investigators, homicide investigators, and internal affairs investigators swarmed the D-4 station. Officer Almeida, the booking officer at the D-4 station, testified that this was the busiest night of his career.

Plaintiff's appeal centers on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389, 392 (2015), which held that pretrial detainees' excessive force claims do not require proof of a defendant officer's subjective state of mind. Plaintiff would have this Court extend *Kingsley* to other types of claims, including denial of medical care claims. But the only type of claim considered by the Supreme Court in *Kingsley* was an excessive force claim, and the text of the decision as well as the Court's reasoning make clear that *Kingsley* changed the law only with respect to pretrial detainees' excessive force claims. Indeed, in *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 70, 74 (1st Cir. 2016), the First Circuit correctly interpreted *Kingsley* as applying only to excessive force claims, evaluating the plaintiff's excessive force claim under an objective-only standard

while evaluating a denial of medical care claim under the two-pronged deliberate indifference standard. Accordingly, the District Court committed no error in this case by instructing the jury that Plaintiff was required to prove the officers' subjective intent.

Plaintiff's interpretation of *Kingsley* is sweeping in scope. She asserts that *Kingsley*, building on decades of precedent that analyzes the differences between the Eighth Amendment and Fourteenth Amendment, effected a sea change in the standard for *all* claims brought by pretrial detainees. The appropriate standard for claims brought by pretrial detainees is an objective-only standard, Plaintiff maintains, because while "convicted prisoners are protected only from punishment that is cruel and unusual[,] pretrial detainees cannot be punished at all." Appellant's Brief ("App. Br.") at 1-2.

But the shortcomings of Plaintiff's formalistic, all-or-nothing approach are immediately apparent. To conceive of what happened to Shayne Stilphen on the early morning of July 14, 2019, as a "punishment" is to commit a serious category error, one that illustrates why *Kingsley* does not and should not apply to a denial of care claim in the context of an acute medical emergency like this one. Unlike the defendant officers in *Kingsley*, the four defendant officers in this case never used force against Stilphen. Nor did the defendant officers take any sort of action against Stilphen that could be characterized as the product of "considered thought."

4

Instead, the four officers are sued for their inaction. More precisely, the four officers are sued for their inattention, and particularly for their inattention in the hour-long period in which Stilphen was overdosing.

This Court need not accept the procrustean framework urged by Plaintiff. That *Kingsley* changed the standard for pretrial detainees' excessive force claims does not mean it changed the standard for other claims raised by pretrial detainees, let alone *all* claims raised by pretrial detainees. In the factual context of this case, applying the objective-only standard would effectuate something that the Supreme Court has repeatedly cautioned against–lowering the standard of constitutional due process to encompass negligence. *See Kingsley*, 576 U.S. at 396 ("liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process") (emphasis in original) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). Because the jury was properly instructed under the two-pronged deliberate indifference standard, this Court should affirm the judgments in favor of the defendant officers.

## **STATEMENT OF THE ISSUES**

Whether the District Court properly applied the two-pronged deliberate indifference standard to Plaintiff's denial of medical care claims against the defendant officers where the First Circuit has already correctly interpreted the

Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), to apply only to excessive force claims.

Whether the qualified immunity doctrine bars the defendant officers' retrial under an objective-only standard where the defendant officers won a jury verdict under the two-pronged deliberate indifference standard and the objective-only standard was not clearly established law in the First Circuit at the time of the decedent's death.

Whether Plaintiff suffered no prejudice from the District Court's application of the objective-only standard given that Plaintiff failed to prove the elements of the objective prong of the deliberate indifference standard with respect to at least two of the defendant officers.

## STATEMENT OF THE CASE

### I.  PROCEDURAL HISTORY.

Plaintiff Lynnel Cox commenced this action in federal district court on June 27, 2022. Appx5. Against the defendant officers, Plaintiff brought failure to provide medical care claims under 42 U.S.C. § 1983, as well as state law wrongful death claims. Against the City, Plaintiff brought a § 1983claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), as well as a claim under the Americans with Disabilities Act ("ADA"). Appx63-66. Before trial, the District Court bifurcated the claims against the City of Boston. Appx115.

Prior to trial, the District Court ruled that it would instruct the jury under the two-pronged deliberate indifference standard, noting while there may be "much to be said" for extending *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), to pretrial detainee due process claims, it was "constrained by pre-*Kingsley* First Circuit precedent unless and until the First Circuit indicates otherwise." Citing *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 74 (1st Cir. 2016), and *Zingg v. Groblewski*, 907 F.3d 630, 634-635 (1st Cir. 2018), the District Court went on to state that "it remains the fact that the two post-*Kingsley* First Circuit cases involving pretrial detainee medical care claims of which the court is aware have applied the Eighth Amendment deliberate indifference standard." Appx21.

The case proceeded to trial on Plaintiff's denial of medical care and wrongful death claims against the four individual officer defendants. After hearing testimony from witnesses over the course of six days, the jury reached a unanimous defense verdict on both the § 1983 and wrongful death claims. Appx21-22. On September 16, 2024, Plaintiff filed a Motion for New Trial, and in the Alternative, Motion for Partial Final Judgment and Stay. Appx23. The District Court denied the motion for a new trial but stayed the ADA claim against the City and entered separate and final judgment against the defendant officers. Appx24-25.

## II.  **FACTS.**

The defendant officers.

The events of this case took place in the early morning of July 14, 2019, at the D-4 police station in Boston. Appx130-131. The four individual defendants, Ismael Almeida, Paulmichael Bertocchi, Catia Freire, and Brian Picarello, are Boston police officers who were working on the overnight shift (11:45 PM to 7:45 AM) at the D-4 station. Appx925; Appx731; Appx647; Appx786.

Officer Almeida worked as the booking officer that morning. Appx830. Officer Bertocchi worked as a patrol officer. Appx730. Officer Freire and Officer Picarello had graduated from the Boston Police Academy in June 2019 – just a few weeks before July 14, 2019. Appx641; Appx782. Both officers had completed fewer than thirty tours of duty, which meant they had to work under the supervision of a field training officer. Appx645; Appx805. Officer Freire worked as a patrol officer under the supervision of Officer Kevin Zarnoch that morning. Appx645. Officer Picarello normally worked the day shift at the D-14 station, but was working the overnight shift on July 14, 2019, at D-4 as an overtime assignment. Appx782-783. During that shift, Officer Picarello was assigned to booking with Officer Almeida, because Officer Almeida's usual partner, who had several years of booking experience, was out on vacation. Appx902. This was the first time that Officer Picarello had ever been assigned to booking. Appx785.

<u>Stilphen is arrested on July 14, 2019, and brought back to the police station.</u>

Around 1:00 AM on July 14, 2019, officers received a call for an individual breaking into a motor vehicle on Massachusetts Avenue. Appx199-210; Appx697. The decedent, Shayne Stilphen, was stopped by a Boston police officer because he matched the description of the suspect. Appx697. Several police officers arrived on scene, including Officer Freire, Officer Zarnoch, and Officer Bertocchi. Appx627. Stilphen was initially cooperative with officers but "became argumentative and refused to stay on scene." Appx699. After he was positively identified as the individual who was breaking into the car, Stilphen was then transported by Officer Freire and Officer Zarnoch to the D-4 police station. Appx654; Appx698.

Surveillance video shows Stilphen arriving in the back of a police cruiser around 1:30 AM. Appx1224 (Ex. 1 at 00:02-0007); Appx1229 (Ex.6 at 00:00-00:20).  He stepped out of the cruiser with his hands cuffed behind his back and walked to the door connecting the sally port to the rest of the police station. Appx1229 (Ex.6 at 00:20-00:46). Immediately thereafter, Stilphen was placed in a group holding cell to await booking. Appx1224 (Ex. 1 at 00:02-0007).

After entering the holding cell, Stilphen had conversations with officers, including Officer Almeida, about the booking process, and he complied with orders to remove his socks and shoes. Appx.846-848; Appx1224 (Ex. 1 at 00:21-

13:56). Officers conducted a thorough search of Stilphen's person.[1] Appx1224 (Ex. 1 at 00:21-07:55). During this period, Stilphen also talked with Officer Bertocchi about basketball, because the two were wearing the same kind of Jordan sneakers. Appx740. Stilphen spoke "normally and coherently" with Officer Bertocchi. Appx743.

At the station, Officer Sean Doolan overheard that Stilphen was the person who had been arrested for breaking and entering into the vehicle. Appx962-963. Prior to working as a Boston police officer, Officer Doolan had worked as a corrections officer at Nashua Street Jail, where he had met Stilphen while Stilphen was serving a sentence there. Appx951, 957-958. Because of this connection, Officer Doolan went to the holding cell to speak with Stilphen. Appx963; Appx1224 (Ex. 1 at 11:33-14:20). Officer Doolan described his conversation with Stilphen, which lasted about two and a half minutes, as "locker room banter." Appx963; Appx1224 (Ex. 1 at 11:33-14:20). Stilphen was "alert" during this

---

[1] Officers did not conduct a strip search of Stilphen, nor were they authorized to do so given that Stilphen had only been arrested for breaking and entering into a motor vehicle and no drugs were found on his person. Appx772; Appx849. At trial, Plaintiff's counsel conceded in her opening statement that "the issue is not about a bad search" and "[t]he officers are limited in the searches they can do." Appx338. Plaintiff does not raise any arguments about the thoroughness or quality of the search in her appeal.

conversation with Officer Doolan. Appx1015. Officer Doolan did not think that Stilphen was intoxicated, or that he needed to go to the hospital. Appx1016-1017.

Stilphen is booked.

At 1:58 AM, Stilphen walked unassisted out of the group holding cell and into the booking area of the D-4 station. Appx1224 (Ex. 1 at 27:12-27:20); Appx1226 (Ex. 3 at 00:07-00:15). After officers searched his shoes, Stilphen put them back on his feet one at a time, first by standing on his left foot, then by standing on his right foot. Appx1226 (Ex. 3 at 00:32-02:00 and 04:36-04:49).

Officer Freire asked to fingerprint Stilphen, because she wanted to gain experience fingerprinting an arrestee. Appx661-662. Officer Freire thought that Stilphen was helpful and cooperative during the fingerprinting process. Appx664. At another point, Officer Almeida and Stilphen made jokes about Officer Bertocchi's shoes. Appx922. After several minutes, because Officer Freire was having a hard time completing the fingerprinting process, Officer Bertocchi took over. Appx669; Appx1226 (Ex. 3 at 01:12-14:50).

Once the fingerprinting process was completed, Stilphen's booking photos were taken by Officer Almeida from behind the booking window. Appx674; Appx1226 (Ex. 3 at 17:44-18:40). Stilphen complied with instructions from Officer Almeida to turn his body and take off his shirt. Appx675; Appx1226 (Ex. 3 at 17:44-21:44). At one-point Stilphen gave Officer Almeida a "thumbs up."

11

Appx675; Appx1226 (Ex. 3 at 18:50-18:58). As part of his booking questions,

Officer Almeida asked Stilphen if he had any preexisting medical conditions or

any medications. Appx910-911. Stilphen answered "no" to both questions.

Appx292; Appx910-911. For the booking form, Stilphen provided Officer Almeida

with information such as his date of birth, mother's maiden name, height, weight,

and father's name. Appx130-131; Appx853. Stilphen did not request medical

attention at any time during booking. Appx814. In a field marked "Medical

Notations," Officer Almeida entered "none." Appx288-297 (Ex. 48 at 292). In

another field marked "State of Consciousness," Officer Almeida entered "Alert."

Appx288-297 (Ex. 48 at 292); Appx911.

During the booking process, Officer Bertocchi read Stilphen his *Miranda*

rights, and Stilphen signed a form acknowledging that he understood what Officer

Bertocchi had told him. Appx757. As part of the routine booking process, Stilphen

would have been offered the opportunity to make a phone call. Appx912-913. The

booking sheet indicates that Stilphen declined to make a phone call. Appx130-131.

After booking was completed, Stilphen walked unassisted out of the booking area

and into one of the cell blocks. Appx677-678; Appx1226 (Ex. 3 at 22:55-23:03).

<u>After being placed in his cell, Stilphen removes drugs from his shorts and ingests
them surreptitiously over the next two hours.</u>

At 2:21 AM, Officers Bertocchi and Freire placed Stilphen in his individual

cell, Cell 19. Appx1228 (Ex. 5a at 0:03-00:10). After he was led into the cell,

Stilphen walked backwards and sat on the cell bench. Appx679; Appx1228 (Ex. 5a at 00:10-00:17). While officers were outside Stilphen's cell conversing, Stilphen bent forward at the waist while seated on the cell bench. Appx680-681; Appx1228 (Ex. 5a at 00:48-01:03). When Officer Bertocchi closed the cell door, Stilphen popped up out of the bent-forward position. Appx681; Appx1228 (Ex. 5a at 01:10-01:38). This was the only time Officer Freire saw Stilphen in the bent-forward position that morning. Appx681. At 2:23 AM, Officers Bertocchi, Freire, and Almeida then left the cell block. Appx1225(Ex. 2a at 01:15-02:13). This was the last time that Officer Freire saw Stilphen. Appx683. At no point did Officer Freire think that Stilphen was intoxicated or in need of medical attention. Appx632.

At 2:32 AM, Officer Bertocchi knocked on the cell door, prompting Stilphen, who was in the bent-forward position, to sit upright. Appx1228 (Ex. 5a at 11:46 - 11:54). Officer Bertocchi put a sandwich and two cartons of milk through the food slot at the bottom of the cell door. Appx1228 (Ex. 5a at 11:51-12:05). Officer Bertocchi then left the cell block. Appx1225 (Ex. 2a at 12:05-12:11). Up to this point, Stilphen was alert and responded to stimulus when he was with Officer Bertocchi. Appx718, 761-762. Officer Bertocchi did not think that Stilphen was intoxicated or had a serious medical need. Appx775. This is the last time Officer Bertocchi saw Stilphen until after Stilphen was discovered unresponsive. Appx774.

After retrieving the cartons of milk and drinking one of them, Stilphen turned his body around and looked directly at the cell's security camera mounted on the ceiling behind him. Appx1228 (Ex. 5a at 11:54-12:27). Stilphen then reached his left hand underneath the back side of his shorts. Appx1228 (Ex. 5a at 12:27-12:37). A few minutes later, Stilphen appears to manipulate a small object in his hand. Appx1228 (Ex. 5a at 19:26-19:28). The position of Stilphen's body in the Cell 19 surveillance video prevents a clear view, but at various intervals over the next two hours, Stilphen ingested drugs. Appx1228 (Ex. 5a - 5e).

Between 2:35 AM and 4:48 AM, Stilphen alternates between sitting upright and leaning forward with his body bent over his waist.

As the booking officer, Officer Almeida was the designee of the duty supervisor who was responsible for conducting 15-minute checks of the prisoners in the cell block. Appx830-831. Various police officers, including Officer Almeida, walk up and down the cell block hallway between 2:35 AM and 4:48 AM, whether to conduct a cell check or to interact with one of the other prisoners on the cell block. Appx1225 (Ex. 2a - 2g). The officers variously see Stilphen (1) sleeping in the leaned-forward position, (2) sleeping in an upright position, and (3) awake while seated. Appx1228 (Ex. 5a at 37:20-37:24); Appx1228 (Ex. 5b at 18:57-20:00); Appx1228 (Ex. 5d at 16:32-17:06); Ex. 1228 (Ex. 5c at 10:50-11:08).

14

At 4:29 AM, Officer Almeida conducted a cell check while Stilphen was still resting against the cell wall. Appx1228 (Ex. 5d at 28:57-29:00). On his way out of the cell block, Officer Almeida stopped and peered closely in Stilphen's cell before continuing on his way. Appx1228 (Ex. 5d at 29:00-29:06).

At 4:40 AM, while seated upright, Stilphen tore off a piece of paper from the sandwich wrapper and held it in his hands as two officers passed his cell on their way out of the cell block. Appx1228 (Ex. 5e at 09:58-11:25); Appx1225 (2e at 10:58-11:15). After the officers left the cell block, Stilphen tore off a piece of a milk carton, rolled it up, and then appeared to sniff or ingest something in his hands. Appx1228 (Ex. 5e at 11:40-12:50).

At 4:43 AM, Officer Picarello conducted a cell check. Appx1225 (2e at 13:12-13:45). When Officer Picarello first passed Stilphen's cell, Stilphen, who was still seated upright on the cell bench, concealed the item in his hand by placing it behind his back. Appx1228 (Ex. 5e at 13:13-13:21). Stilphen continued to conceal the item as Officer Picarello passed the cell on his way out of the cell block. Appx1228 (Ex. 5e at 13:21-13:45).

At 4:46 and 4:48 AM, Stilphen manipulated an item in his hands. Appx1228 (Ex. 5e at 16:11 -16:52; 18:03-18:17). At 4:48 AM, Stilphen leaned forward at the waist. Appx1228 (Ex. 5e at 18:24-18:40). From that point forward, he never sat upright again.

<u>The D-4 station becomes the site of an investigation after Joseph Perry suffers a
fatal injury.</u>

While Stilphen was in his individual cell, another prisoner, Joseph Perry,
was being transported back to the D-4 station for booking. Appx925; Appx926.
Perry was involved in a sexual assault and "there was an active fight to get [him] in
custody." Appx999. Perry was combative and it took 15 to 20 officers to handcuff
him and get him in the wagon. Appx965; Appx1000. Once they arrived at the D-4
station, Perry initially refused to get out of the wagon. Appx768. Perry then
appeared to comply with officer orders to step out of the wagon before beginning
to "smash his head several times" on the metal handle bar on the side of the wagon.
Appx769. Perry began to "profusely bleed" from his face. Appx769; Appx966.

Officer Doolan was one of the officers "trying to remove [Perry] from the
wagon" after he had bashed his head. Appx966. Officer Doolan was covered in
Perry's blood and said that the scene was like a "horror movie." Appx966. After
Perry was taken away by EMS around 4:00 AM, Officer Doolan showered and
changed into a clean uniform. Appx876; Appx966-967.  However, there was "no
pause button" for Officer Almeida at the booking desk. Appx931. The whole sally
port area, located near the booking desk, was a crime scene. Appx875; Appx931.
The Homicide, Internal Affairs, and Crime Scene Response units of the Boston
Police were all called to the D-4 station to conduct an investigation. Appx875. As
the booking officer, Officer Almeida had to help the other units access the booking

area. Appx931-932. In addition to helping the investigation, Officer Almeida still had prisoners to book, calls to answer, and cell checks to conduct. Appx932. This was "the busiest night of [Officer Almeida's] career." Appx857. And while Officer Picarello was also assigned to the booking area, given his lack of experience, he was "really no help to [Officer Almeida]." Appx902.

Officers conduct cell checks after 4:48 AM.

Officer Almeida conducted cell checks between 4:55 AM and 5:36 AM. Appx937; Appx939; Appx1225 (Ex. 2e-2g). During these checks, Officer Almeida thought that Stilphen was sleeping and did not need medical attention. Appx933. Because of his experience at the booking desk at D-4, Officer Almeida had seen many individuals who "sleep in all kinds of weird positions." Appx934.

At 5:38 AM, Officer Picarello entered the cell block to bring food to the prisoners. Appx822; Appx1225 (Ex. 2g at 08:31-09:13). Officer Picarello placed some items in Stilphen's food slot and looked into Stilphen's cell. Appx1225 (Ex. 2g at 9:10-9:23); Appx1228 (Ex. 5g at 09:03-09:16). Officer Picarello then continued going down the cell block. Appx1225 (Ex. 2g at 09:52-10:14). Officer Picarello thought that Stilphen was sleeping and did not believe that he needed medical attention. Appx823.

<u>Officers attempt to resuscitate Stilphen after he is discovered unresponsive.</u>

Shortly before 5:51 AM, Officer Doolan was assisting the crime scene cleanup team in the sally port area. Appx968; Appx1225(Ex. 2g at 21:37-21:42). Because the booking officers were involved in booking a prisoner who could not be booked earlier, Officer Doolan conducted a check of the cell block. Appx968. This was Officer Doolan's first and only cell check that evening. Appx968.

When he passed by Stilphen's cell, Officer Doolan's "attention was just drawn to [him]." Appx969. Stilphen was bent forward at the waist. Appx1228 (Ex. 5g at 21:36-21:40). Officer Doolan continued walking down the cell block to check on the other prisoners in their cells. Appx1225 (Ex. 2g at 21:37-21:48); Appx969. On his way out of the cell block, Officer Doolan "kicked on the door" to Stilphen's cell and "called out [Stilphen's] name a couple of times." Appx969; Appx1228 (Ex. 5g at 21:39-21:53); Appx1225 (Ex. 2g at 21:57-22:12). After receiving no response from Stilphen, Officer Doolan called for Officer Almeida. Appx969; Appx1228 (Ex. 5g at 22:00-22:02); Appx1225 (Ex. 2g at 22:13-22:25).

Officer Almeida came to the cell block with the key. Appx1228 (Ex. 5g at 22:08). Officer unlocked the door, entered the cell, and tapped Stilphen on the shoulder. Appx884; Appx1228 (Ex. 5g at 22:09-22:22:25). Stilphen's body fell backwards. Appx1228 (Ex. 5g at 22:25-22:27). After Officer Almeida moved Stilphen's legs, he found a straw that had been made out of a milk carton with

18

some powder on it. Appx884-885; Appx1228 (Ex. 5g at 22:28-22:35). Until this point, Officer Almeida had no idea that Stilphen had been using drugs in his cell that night. Appx942. Officer Almeida immediately began performing CPR on Stilphen. Appx943; Appx1228 (Ex. 5g at 22:43-22:49). Having seen the milk carton with powder, Officer Almeida believed that there was "heroin or fentanyl in the cell" and asked Officer Doolan to get Narcan. Appx943.

After Officer Doolan returned to the cell with Narcan, Officer Bertocchi entered the cell and took over performing CPR for Officer Almeida. Appx1228 (Ex. 5g at 23:30 -24:00). Officer Almeida grabbed another officer's radio and went to a different location to request EMS. Appx944. Based on his experience at the D-4 station, Officer Almeida knew that the radio sometimes did not work from inside the cell block. Appx944. At around 5:58 AM, EMS arrived and entered Stilphen's cell. Appx1228 (Ex. 5g at 27:45-28:07). Officers were able to administer about three doses of Narcan before EMS arrived. Appx970-971. Around 6:02 AM Stilphen was placed on a stretcher and was transported to the hospital. Appx1228 (Ex. 5g at 31:50-32:12).

Stilphen died later that morning. Appx471. The toxicology report for Stilphen indicated the "presence of multiple substances," including fentanyl. Appx472. An analysis of the drugs that Stilphen had brought into the cell showed that it also contained fentanyl. Appx486.

19

<u>Plaintiff's medical expert testified that Stilphen began to suffer an overdose at 4:48 AM.</u>

Plaintiff called Dr. Ross MacDonald as an expert on the treatment of substance use disorders. Appx448. Based on his review of the surveillance video of Stilphen's cell, Dr. MacDonald identified 4:48 AM–when Stilphen went into the bent-forward position for the final time–as the moment at which Stilphen began to overdose. Appx478; Appx1228 (Ex. 5e at 18:24-18:40).

Dr. MacDonald testified that prior to 4:48 AM, Stilphen was showing signs of intoxication rather than overdose. Appx490. In particular, Dr. MacDonald observed that prior to 4:48 AM, Stilphen was moving around; he was responsive to different stimuli, including when officers brought him food; and he appeared to remove drugs from his shorts and ingest them. Appx477. In Dr. MacDonald's opinion, the question of whether to send an intoxicated detainee to the hospital concerns thresholds: a detainee who shows signs of drug intoxication need not necessarily be sent to the hospital. Appx499. Dr. MacDonald testified that prior to 4:48 AM, the appropriate medical treatment would have been monitoring Stilphen's condition. Appx490.

<u>The District Court indicated that it would enter a judgment in favor of at least two of the defendant officers.</u>

At the close of Plaintiff's case, the four defendant officers moved for a directed verdict. Appx1090-1091. The District Court noted that it would heed the

First Circuit's advice to "first put the whole case to a jury, and then if a ruling need be made, make it as a matter notwithstanding the verdict." Appx1092. At the same time, the court stated: "[I]t's almost 100 percent certain that I'm going to allow, if that happens, a judgment, notwithstanding the verdict, with respect to Officers Bertocchi and Freire. I'm even open-minded to hear an argument about Officer Picarello, but the first two officers, they were gone before . . . anything would have alerted them to any . . . serious medical need that required their intervention in that state . . . ." Appx1092.

## SUMMARY OF THE ARGUMENT

Defendants agree with Plaintiff that the question raised by this appeal is whether the District Court properly applied the two-pronged deliberate indifference standard to Plaintiff's denial of medical care claim.

I.        The Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), changed the standard for pretrial detainees' excessive force claims but has no bearing on denial of medical care claims. Plaintiff's contention that *Kingsley*'s holding extends beyond excessive force claims ignores the plain language and reasoning of that decision.

In addition, the unique factual constellation of this case militates against applying *Kingsley* here. Specifically, unlike other cases cited by Plaintiff, this case involved a detainee who actively concealed his medical needs from the defendant

21

officers and who suffered an acute medical emergency that unfolded over a short period of time. The defendant officers are not sued for their action or even their inaction but rather for their inattention. Applying an objective-only standard to the facts of this case would collapse deliberate indifference into negligence–an outcome that the Supreme Court explicitly repudiated in *Kingsley*, 576 U.S. at 396.

The First Circuit has already correctly ruled that *Kingsley* does not apply to pretrial detainees' denial of medical care claims. Specifically, in *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64 (1st Cir. 2016), the First Circuit cited and discussed *Kingsley* but nonetheless analyzed the plaintiff's medical care claim under the deliberate indifference standard. *Miranda-Rivera* was followed by *Zingg v. Groblewski,* 907 F.3d 630, 634-635 (1st Cir. 2018), in which the First Circuit again applied the two-pronged deliberate indifference standard to a denial of medical care claim. This Court is bound by its previous decisions in *Miranda-Rivera* and *Zingg* under the "law of the circuit" doctrine.

Those circuits that have declined to extend *Kingsley* outside of the excessive force context have correctly concluded that *Kingsley* is an excessive force case with no applicability to other kinds of Fourteenth Amendment claims. In particular, the Tenth Circuit's decision in *Strain v. Regalado*, 977 F.3d 984 (10th Cir. 2020), offered compelling reasons not to apply *Kingsley* outside of the excessive force context. Those circuits that have extended *Kingsley* to other claims raised by

pretrial detainees have ignored the plain text and reasoning of the *Kingsley* decision.

Plaintiff's reliance on *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), and its standard asking whether the defendant officers "should have known of [the detainee's] condition," is misplaced. *Short* concerned a pretrial detainee who informed the defendant officers that she was suicidal and suffering withdrawal, and *Short*'s "should have known" standard is explicitly a negligence standard that was adapted for failure to prevent suicide claims.

II.     In any event, given that an objective-only standard was not clearly established law at the time of the decedent's death in July 2019, and the defendant officers won a jury verdict under the two-pronged deliberate indifference standard, the qualified immunity doctrine bars their retrial under the objective-only standard. The Sixth Circuit, a court which is otherwise favorably cited by Plaintiff in her brief, came to a similar conclusion in *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919 (6th Cir. 2024).

III.     The District Court's instructions were not prejudicial to Plaintiff's claims against at least two of the defendant officers. At trial, the District Court stated that Plaintiff failed to meet her burden with respect to the objective element of the two-pronged deliberate indifference test for Officer Freire and Officer Bertocchi, and perhaps even for Officer Picarello.

23

**ARGUMENT**

I.  ***Kingsley* does not apply to Plaintiff's denial of medical care claims against the defendant officers.**

Despite making *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the centerpiece of her appeal, Plaintiff devotes very little of her brief to discussing the details of that decision. This Court should begin with a close review and analysis of *Kingsley*.

**A. Kingsley held that the objective reasonableness standard applies to pretrial detainees' claims of excessive force.**

The plaintiff in *Kingsley* was arrested on a drug charge and detained in a county jail prior to trial. 576 U.S. at 392. Over the course of several hours, the plaintiff refused to comply with officers' requests to remove a piece of paper covering the light fixture above the petitioner's bed and then to move to another cell. Officers handcuffed the plaintiff, forcibly removed him from the cell, carried him to a receiving cell, and placed him face down in a bunk with his hands cuffed behind his back. *Id.* There ensued a struggle in which one of the officers placed his knee on the plaintiff's back and another officer applied a five-second taser shock. *Id.* at 392-393. "The question before us," the Court stated at the outset of the opinion, "is whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively*

24

unreasonable." *Id.* at 391-392 (emphasis in original). The Court concluded that the latter standard was the correct one. *Id.* at 392.

The Court explained that the objective standard concerned "the defendant's state of mind with respect to the proper *interpretation* of the force (a series of events in the world) that the defendant deliberately (not accidentally or negligently) used." *Id.* at 396 (emphasis added). The Court illustrated this point by posing a hypothetical involving various acts of excessive force. "Consider the series of physical events that take place in the world—a series of events that might consist, for example, of the swing of a fist that hits a face, a push that leads to a fall, or the shot of a Taser that leads to the stunning of its recipient." *Id*. at 395. The Court observed that with respect to these uses of force, the defendant must possess "a purposeful, a knowing, or possibly a reckless state of mind," as "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* at 395-396 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)) (emphasis in original).

Next, citing *Graham v. Connor*, 490 U.S. 386, 396 (1989), the Court explained that the objective reasonableness standard for excessive force "turns on the 'facts and circumstances of each particular case,'" and that the determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."

*Kingsley*, 576 U.S. at 397. Again drawing from *Graham*, the Court recited a list of factors bearing on the reasonableness of the force used: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* (citing *Graham*, 490 U.S. at 396).

The Court listed a number of considerations that led it to conclude that the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one. First, the Court reasoned that an objective-only standard was consistent with prior decisions in which it had determined that a pretrial detainee can prevail by showing that the actions of defendant officers are not "rationally related to a legitimate nonpunitive governmental purpose" or "appear excessive in relation to that purpose." *Id.* at 398 (quoting *Bell v. Wolfish*, 441 U.S. 520, 561 (1979)). Second, the Court maintained that the objective standard was workable, as many correctional facilities already trained correctional officers to act as if their conduct is subject to the objective reasonableness standard. *Id.* at 399. Finally, citing *Graham*, 490 U.S. at 397, once again, the Court noted that an objective standard would adequately protect officers who act in good faith. *Id*. at 399-400.

Justice Scalia wrote a dissenting opinion. Justice Scalia agreed that the Court's precedents made "intent to punish the focus of its due process analysis," but wrote that it would be "*illogical* . . . automatically to infer punitive intent from the fact that a prison guard used more force against a pretrial detainee than was necessary." *Id.* at 406. He cautioned that an officer's decision regarding the amount of force to apply is made "'in haste, under pressure, and frequently without the luxury of a second chance,' not after the considered thought that precedes detention-policy determinations" like the double bunking policy in *Bell*. *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)).

## B. Plaintiff's expansive interpretation of *Kingsley* is at odds with the plain text and reasoning of that opinion.

Plaintiff advances a sweeping interpretation of *Kingsley* in her brief. On Plaintiff's reading, *Kingsley* applies not merely to excessive force claims but rather to *all* Fourteenth Amendment claims raised by pretrial detainees. Plaintiff writes that "[b]uilding on decades of precedent, *Kingsley* distinguished cases that had applied a subjective standard under the Eighth Amendment and determined that, in contrast, a pretrial detainee must only show that an officer's actions were objectively unreasonable under the Due Process Clause." App. Br. 28.

A cursory review of *Kingsley* makes clear that Plaintiff's far-ranging interpretation of that decision is without merit. Put plainly, *Kingsley* is an

excessive force case. The only type of claim raised by the plaintiff and considered by the Court in *Kingsley* was excessive force. The word "force" appears dozens of times in the *Kingsley* majority opinion, often in contexts where the Court was unmistakably delineating the scope of its opinion. *See, e.g.*, 576 U.S. at 397 ("Several considerations have led us to conclude that the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one."); *id*. at 400 ("Respondents believe that the relevant legal standard should be subjective, *i.e.,* that the plaintiff must prove that the use of force was not 'applied in a good-faith effort to maintain or restore discipline' but, rather, was applied "'maliciously and sadistically to cause harm.'"); *id.* at 402-403 ("We now consider the lawfulness of the jury instruction given in this case in light of our adoption of an objective standard for pretrial detainees' excessive force claims.").

In addition, the reasoning employed by the Court in *Kingsley* hinged on considerations that are unique to excessive force claims. The Court explained that the objective standard concerned the interpretation of a use of force rather than the state of mind with respect to physical acts, and posited hypotheticals involving three types of force to illustrate the point. *Id.* at 395-396. Citing *Graham v. Connor*, 490 U.S. at 396, the seminal case on excessive force, the Court also set forth a list of factors bearing on the reasonableness of the force used. *Kingsley*, 576 U.S. at 397. Those factors—such as "any effort made by the officer to temper or to

28

limit the amount of force," "the threat reasonably perceived by the officer," and "whether the plaintiff was actively resisting"—simply have no applicability outside of the excessive force context. *Id.*

In support of her expansive reading of *Kingsley*, Plaintiff points to "additional steps taken" by the Supreme Court that "further indicate that its holding extends far beyond the excessive-force claim at issue in that case." App. Br. 28-29. None of these "additional steps" withstands scrutiny.

First, Plaintiff argues that *Kingsley,* 576 U.S. at 398, "articulated a test that encompassed all-pretrial detainee Due Process claims" in its statement that "a pretrial detainee can prevail by providing only objective evidence that the *challenged government action* was not rationally related to a legitimate governmental objective or that it was excessive in relation to that purpose." App. Br. 28. Plaintiff asserts that the Court could have "easily limited 'challenged governmental action' to excessive force [but] made no attempt to do so." App. Br. 28. But textual considerations weigh decisively against Plaintiff's interpretation of *Kingsley*. Over and against the Court's numerous mentions of force, Plaintiff asks this Court to adopt a far-ranging interpretation of *Kingsley* on the basis of a phrase that appears one time in that opinion.[2]

---

[2] The single appearance of the phrase "challenged governmental action" in *Kingsley* is a far cry from the broad language used by the Supreme Court in *Kimbrough v. United States*, 552 U.S. 85 (2007), a case cited by Plaintiff in her

Second, Plaintiff argues that *Kingsley*, 576 U.S. at 398, heavily relied on

*Bell*, which evaluated a challenge to "a variety of prison conditions, including a

prison' practice of double-bunking." While it is true that *Kingsley* cited and

discussed *Bell*, the conclusion that the Supreme Court therefore changed the

standard for *all* claims brought by pretrial detainees does not follow from that

premise. For one thing, such an assertion flies in the face of the rest of the text and

reasoning of *Kingsley*, as discussed above. Further, *Kingsley* did not cite or discuss

*Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court decision that first set

forth the two-pronged deliberate indifference standard. The Court would not have

done away with *Farmer*'s deliberate indifference standard for all due process

claims raised by pretrial detainees without even mentioning *Farmer*.

Finally, citing *Wilson v. Seiter*, 501 U.S. 294, 302 (1991), Plaintiff argues

that the Supreme Court has historically applied "*more* deference to cases involving

---

brief. App. Br. 38. In *Kimbrough*, which considered a district court's discretion to
depart from the Sentencing Guidelines' differential treatment of crack and powder
cocaine, the Supreme Court expressly stated that "courts may vary from Guidelines
ranges based solely on policy considerations, including disagreements with the
Guidelines." *Id.* at 101 (internal citations omitted). The First Circuit therefore
recognized in *United States v. Rodriguez*, 527 F.3d 221, 227 (1st Cir. 2008), that
this pronouncement from *Kimbrough* would have implications for other sentencing
issues, such as disparities caused by a fast-track program. By contrast, the fact that
in *Kingsley* the Supreme Court once used the phrase "challenged governmental
action" in an opinion that otherwise discussed only force is emphatically not a
"gloss" or "prism," *Rodriguez*, 527 F.3d at 225, 226, by which this Court can
extend the objective-only standard to a denial of medical care claim.

30

prison officials' use of force because they 'are necessarily taken in haste, under pressure, and balanced against corporate institutional concerns for the safety of prison staff or other inmates.'" App. Br. 29. Whatever merit this argument may have for other pretrial detention claims, it is unavailing in the context of this case, which involved an acute medical emergency that unfolded in a little more than an hour. The overdose death in this case has little in common with *Wilson*, which concerned generalized complaints about a prisoner's conditions of confinement, namely "overcrowding, excessive noise, insufficient locker storage space, inadequate heating and cooling, improper ventilation, unclean and inadequate restrooms, unsanitary dining facilities and food preparation, and housing with mentally and physically ill inmates." 501 U.S. at 296.

In sum, if the Supreme Court in *Kingsley* had intended to reject the subjective standard not merely for excessive force claims but for *all* Due Process claims by pretrial detainees, then it would have done so unambiguously. It would not have repeatedly stressed that its decision concerned pretrial detainees' claims of excessive force, nor would it have left lower courts and practitioners to divine the full scope of its holding through a citation to *Bell* and the single mention of the term "challenged governmental action." By asking this Court to extend *Kingsley* to non-excessive force claims despite the lack of textual support, Plaintiff would have this Court arrogate a power that the Supreme Court has stated lies only with itself:

> We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'

*Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quiejas v. Shearson/ Am. Express, Inc.*, 490 U.S. 477, 485 (1989)); *see also R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 386 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned.").

**C. Applying an objective-only standard in the specific context of this case would collapse deliberate indifference into negligence.**

Plaintiff's insistence that *all* claims raised by pretrial detainees must be evaluated under an objective-only standard is an elevation of form over substance. Plaintiff relies on the formalistic category of inadequate medical care claims to argue that the application of the objective-only test follows almost automatically from case law (App. Br. 29, 34-35), thus obscuring the important factual differences between other inadequate medical care cases and this case. But "[r]ules of due process are not . . . subject to mechanical application in unfamiliar territory." *Lewis*, 523 U.S. at 850.

Indeed, there are compelling reasons not to apply an objective-only standard against the particular factual backdrop of this case. Three considerations stand out in particular. First, Stilphen actively worked against the surveillance protocols that were designed to protect his own safety, thereby depriving the defendant officers of important information about his medical condition. Notwithstanding Plaintiff's assertion that Stilphen was showing signs of intoxication when he arrived at the police station, Stilphen denied having recently taken any medications or having any pre-existing medical conditions when he was booked. Appx292; Appx910-911. More importantly, a matter of minutes after being placed in his cell, Stilphen removed a baggie of drugs that he had smuggled into the police station and ingested its contents surreptitiously over the next two hours, making sure to keep his actions secret both from the surveillance camera mounted in the corner of his cell and from officers conducting checks of the cell block. Appx1228 (Ex. 5a at 12:27-12:37); Appx1225 (2e at 13:12-13:45); Appx1228 (Ex. 5e at 9:58-12:50).

Second, as a result of his secret consumption of fentanyl, Stilphen eventually suffered an acute medical emergency that left the defendant officers with little time to intervene. The testimony of Plaintiff's own medical expert confirms that Stilphen did not begin to overdose until 4:48 AM, more than two hours after he first began ingesting the drugs he had secretly brought into the police station. Appx478; Appx1228 (Ex. 5a at 19:26-19:28); Appx1228 (Ex. 5e at 18:24-18:40).

33

The critical time window in this case is thus the roughly hour-long period between 4:48 AM, when Stilphen began overdosing, and 5:51 AM, when officers discovered him unresponsive. Appx1228 (Ex. 5g at 22:21-22:22:25).

Third, during the period in which Stilphen was overdosing, officers were contending with uniquely chaotic conditions at the police station–namely, the aftereffects of a violent prisoner death in the wagon bay. Officer Almeida testified that this was "the busiest night of his career," and Officer Picarello, given his lack of experience, was "really no help" to him. Appx687; Appx902. Even more than the use of force in *Kingsley*, 576 U.S. at 392-393, which occurred several hours after the detainee first committed a relatively minor act of insubordination, the actions of the defendant officers in this case were taken "in haste, under pressure, and . . . without the luxury of a second chance." *Hudson*, 503 U.S. at 6.

This case is thus unlike the other pretrial detention cases cited by Plaintiff in her brief. For instance, in the principal post-*Kingsley* denial of care cases from other circuits cited by Plaintiff, the defendant officers (a) had actual notice of the pretrial detainee's true medical condition; and (b) nonetheless failed to respond to a medical need that developed over many hours, if not days. *See Lara-Grimaldi v. County of Putnam*, 132 F.4th 614, 618, 620 (2d Cir. 2025) (pretrial detainee who informed booking officer of recent heroin injection and previous suicide attempt and later complained about withdrawal symptoms was discovered hanging by bed

34

sheet almost fifteen hours after being placed in individual cell); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 341-342 (7th Cir. 2018) (pretrial detainee who previously made suicidal statements died from complications of starvation and dehydration after refusing to eat or drink over period of two weeks days in jail); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1121-1122 (9th Cir. 2018) (pretrial detainee who reported recent heroin use vomited continuously for 45-minute period while waiting to be placed in general population and was discovered unresponsive almost thirty hours after he was brought to jail).

This case is also a far cry from the Supreme Court case that first recognized inadequate medical treatment as a claim in the Eighth Amendment context under 42 U.S.C. § 1983, *Estelle v. Gamble*, 429 U.S. 97 (1976). *Estelle* involved a prisoner who experienced severe back pain over a three-month period after he suffered an injury while performing heavy labor. *Id.* at 99-101. Despite the plaintiff's complaints, prison officials refused to let him move from an upper bunk to a lower bunk and certified him as capable of light work. *Id.* at 99-100. When the plaintiff claimed that he was in too much pain to work, prison officials moved him first to administrative segregation and then to solitary confinement. *Id.* at 100-101. Although *Estelle* and the instant case both involve claims denominated "inadequate medical care" or "denial of medical care," the differences between the two cases are enormous.

The comparison with other cases makes clear that this case sits on the extreme end of a "spectrum of culpability," verging toward inadvertent conduct. *See Lewis*, 523 U.S. at 848 (noting that it is "behavior at the other end of the culpability spectrum [i.e. 'conduct intended to injure in some way unjustifiable by any government interest'] that would most probably support a substantive due process claim"). Some circuit courts have declined to extend *Kingsley* to pretrial detainees' deliberate indifference claims on the grounds that deliberate indifference often stems from inaction, and a failure to act does not raise an inference of punitive intent in the same way that an affirmative act like excessive force does. *See Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020) *(*quoting *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1086 (9th Cir. 2016) (Ikuta, J., dissenting)). But this case fits in an exclusive subcategory of inaction cases, namely inaction in the face of a concealed, acute medical emergency. The defendant officers are sued not for their action or even their inaction but for their inattention.

Applying an objective-only standard to the facts of this case would collapse deliberate indifference into negligence. Such an outcome was rejected by the Supreme Court in *Kingsley*, which reaffirmed that "liability for *negligently* inflicted harm . . . is categorically beneath the threshold of constitutional due process." 576 U.S. at 396 (internal quotation marks omitted) (emphasis in original); *see also Daniels v. Williams*, 474 U.S. 327, 330-31 (1986) ("mere lack of

36

due care by a state official" does not "'deprive' an individual of life, liberty, or property under the Fourteenth Amendment"); *cf. Estelle*, 429 U.S. at 106 (" Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). For this reason, the objective-only standard does not govern Plaintiff's denial of medical care claims against the defendant officers.

### D. In *Miranda-Rivera* and *Zingg*, the First Circuit correctly declined to extend *Kingsley* outside the excessive force context.

In its order stating that it would instruct the jury under the two-pronged deliberate indifference standard rather than an objective standard, the District Court cited two post-*Kingsley* cases, *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64 (1st Cir. 2016), and *Zingg v. Groblewski,* 907 F.3d 630 (1st Cir. 2018). The District Court was right to do so: the First Circuit has already rejected Plaintiff's interpretation of *Kingsley* in those two cases.

In *Miranda-Rivera*, a pretrial detainee died at a police station shortly after his arrest for operating a motor vehicle under the influence of alcohol. 813 F.3d at 67-68. Crucially, the plaintiffs in *Miranda-Rivera*, the decedent's family, brought two sets of § 1983 claims against the police officers who interacted with the decedent. *Id.* at 67. First, the plaintiffs brought an excessive force claim, alleging that the decedent suffered physical trauma stemming from the force applied by officers to get him into the patrol car and then into the holding cell. *Id.* at 67-68.

Second, the plaintiffs brought a claim for denial of medical care, alleging that the officers were deliberately indifferent to a serious medical need the decedent had at the time of his arrest. *Id.* at 74-75.

In considering the plaintiff's excessive force claims, the First Circuit noted that although there had been a circuit split regarding the standard for a pretrial detainee's claim of excessive force, the Supreme Court's decision in *Kingsley* made clear that the standard is one of objective reasonableness. *Id.* at 70. Specifically, the First Circuit interpreted *Kingsley* as "extend[ing] the objective reasonableness standard for use of force from the arrest stage through the probable cause hearing." *Id*. By contrast, the First Circuit did not cite *Kingsley* when analyzing the plaintiff's denial of medical care claim. *Id.* at 74. Instead, this Court applied the two-prong deliberate indifference standard derived from *Farmer*. *Id.* The First Circuit's interpretation of *Kingsley* in *Miranda-Rivera* was correct. *Kingsley* changed the standard for excessive force claims brought by pretrial detainees, but nothing in its text or reasoning indicated that it changed the standard for denial of medical care claims.

*Miranda-Rivera* was followed two years later by *Zingg*, 907 F.3d at 633-634, which involved a pretrial detainee who sued a correctional facility and its medical director after his requests for specific prescription medications to treat his psoriasis were repeatedly denied. In evaluating the plaintiff's § 1983 claim for

38

denial of medical care, the First Circuit once again applied the two-pronged deliberate indifference standard. *Id.* at 634-635.

*Miranda-Rivera* and *Zingg* are binding on this Court. According to the "law of the circuit" doctrine, "newly constituted panels must follow the rulings of preceding panels that are "directly (or even closely) on point, even where the succeeding panel disagrees with the prior one." *United States v. Perez*, 89 F.4th 247, 250 (1st Cir. 2023). The law of the circuit rule is a subset of stare decisis and is "one of the building blocks on which the federal judicial system rests." *San Juan Cable LLC v. P.R. Tel. Co.*, 612 F.3d 25, 33 (1st Cir. 2010). Exceptions to this rule are "extremely narrow and their incidence is hen's-teeth-rare." *Id.* This is not a situation in which the prior cases have been "contradicted by controlling authority, subsequently announced," *United States v. Rodríguez*, 527 F.3d 221, 225 (1st Cir. 2008), as both *Miranda-Rivera* and *Zingg* were decided after *Kingsley*. Nor do decisions from other circuits constitute authority that "although not directly controlling, nevertheless offer[] a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind." *San Juan Cable*, 612 F.3d at 33 (internal citations omitted).

Plaintiff argues that neither *Miranda-Rivera* nor *Zingg* bind this Court to apply a subjective standard because neither case was "presented with or discussed the matter of these two competing standards [and] even more fundamentally,

neither actually decided the standard that applies to pretrial detainees' Due Process claims." App. Br. 41. Given that *Kingsley* was decided after the principal briefs in *Miranda-Rivera* were filed, it is true that the parties did not have the opportunity to discuss *Kingsley* in those pleadings. Yet *Kingsley* was decided before the First Circuit issued the opinion in *Miranda-Rivera*, and as noted above, the First Circuit discussed and analyzed *Kingsley* in *Miranda-Rivera* without the parties' having briefed it. Unlike the Supreme Court in *Webster v. Fall*, 266 U.S. 507, 511 (1925), the First Circuit in *Miranda-Rivera* took notice of *Kingsley* on its own and directly ruled about its applicability to denial of medical care claims.

Taken together, Plaintiff's arguments about *Kingsley* and *Miranda-Rivera* rest on a fatal contradiction. On the one hand, Plaintiff asserts that the First Circuit has never ruled on the full applicability of *Kingsley*, despite the fact that in *Miranda-Rivera*, the First Circuit cited and discussed *Kingsley*, applying the objective standard to an excessive force claim but not to a denial of medical care claim. On the other hand, Plaintiff argues that *Kingsley* effected a far-reaching change in the law of pretrial detention even though the only type of claim brought by the plaintiff and considered by the Court in *Kingsley* was an excessive force claim, and even though the Court never mentioned or engaged with *Farmer*'s deliberate indifference standard. By the very case law cited by Plaintiff in her brief, this Court is not permitted to construe *Kingsley* in such a sweeping manner. *See*

40

*Webster*, 266 U.S. at 511 ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). The First Circuit properly exercised caution in *Miranda-Rivera*, and it must follow that ruling in deciding this case.

### E. Case law from other circuit courts does not help Plaintiff.

Plaintiff devotes a significant portion of her brief to discussing out-of-circuit cases addressing *Kingsley*'s applicability to due process claims other than excessive force.

### 1. The four circuit courts that have declined to apply Kingsley outside of the excessive force context have offered compelling reasons for doing so.

In surveying case law from outside the First Circuit, Plaintiff correctly notes that the Fifth, the Eighth, and the Eleventh Circuits have all declined to extend *Kingsley* to non-excessive force claims. *See Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (noting that Fifth Circuit has continued to apply subjective standard post-*Kingsley*); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) ("*Kingsley* does not control [a failure to prevent suicide claim] because it was an excessive force case, not a deliberate indifference case."); *Dang ex rel. Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) ("*Kingsley* involved an excessive-force claim, not a

claim of inadequate medical treatment due to deliberate indifference.").[3] Plaintiff dismisses these cases as providing "little reasoning to speak of." App. Br. 33. But while not lengthy, the analysis of *Kingsley* in cases like *Whitney* and *Dang* is fundamentally correct: *Kingsley* is an excessive force case. The First Circuit came to the identical conclusion in *Miranda-Rivera* when it applied the objective standard from *Kingsley* to an excessive force claim but not to a denial of medical care claim.

Defendants agree with Plaintiff that the case that offered the most extensive explanation for the continued application of the subjective standard to Due Process Clause claims by pretrial detainees is the Tenth Circuit's decision in *Strain*. The Tenth Circuit provided three reasons for declining to extend *Kingsley* to deliberate indifference claims.

First, *Strain* noted that *Kingsley* turned on considerations that are unique to excessive force claims. *Id.* at 991. *Strain* observed that nothing in the text of *Kingsley* suggests the Court intended to extend the objective-only standard to all claims by pretrial detainees or deliberate indifference claims specifically. *Id.* The Tenth Circuit further argued that *Kingsley* is inapplicable because it involved a use

---

[3] In addition, in an unpublished opinion, the Third Circuit expressed doubts about the applicability of *Kingsley* outside of the excessive force context while ultimately declining to address the issue. *See Moore v. Luffey*, 767 Fed. Appx. 335, 340 n.2 (3d. Cir. 2019).

of force amounting to punishment, whereas deliberate indifference concerns adequate access to medical care. *Id*. Plaintiff's assertion that the distinction between excessive force claims and denial of medical care claims is "nothing but a mirage," App. Br. 34, overemphasizes *Kingsley*'s citation to *Bell* in a decision that is otherwise only about excessive force. Plaintiff also attempts to rebut the punishment/ medical care distinction by citing *Estelle*, even though *Estelle* and this case have very little in common besides the label "denial of medical care."

Second, the Tenth Circuit observed that in contrast to an excessive force claim, a "deliberate indifference claim presupposes a subjective component." *Id.* at 992. The term deliberate means "intentional," "premeditated," or "fully considered." *Id.* (quoting *Black's Law Dictionary* 539 (11th ed. 2019)). To remove the subjective component from the deliberate indifference standard would "erode the intent requirement inherent in the claim." *Id.* at 992 (citing *Farmer*, 511 U.S. at 835).

Finally, the Tenth Circuit observed that "principles of *stare decisis* weigh against overruling precedent to extend a Supreme Court holding to a new context or new category of claims." *Id.* at 991. The argument from *stare decisis* principles holds true in general, but it weighs particularly strongly in this case given that the First Circuit has already declined to extend *Kingsley* to denial of medical care claims in *Miranda-Rivera* and *Zingg*. Plaintiff contends that *Strain*'s "cramped

43

reading" of *Kingsley* ignores the reasoning of that decision. App. Br. 36. In making this argument, however, Plaintiff disregards cases like *Agostini* and *R.A.V.*—both cited by the Tenth Circuit in *Strain*—which make clear that lower courts should exercise caution before extending a Supreme Court decision to a new category of claims on the basis of vague hints and implied reasoning.

*Strain*, 977 F.3d at 993 n.6, is also significant in that it distinguished *Colbruno v. Kessler*, 928 F.3d 1155, 1159 (10th Cir. 2019), an earlier Tenth Circuit case that applied the *Kingsley* framework to a pretrial detainee's claim against jail deputies for walking him through the public areas of a hospital completely unclothed except for a pair of orange gloves. In *Strain*, the Tenth Circuit noted that it had applied *Kingsley* to the plaintiff's claims in *Colbruno* because *Colbruno*, which may be considered a conditions of confinement case, "dealt with the appropriateness of punishment." 977 F.3d at 993 n.6. By contrast, *Strain* did not apply *Kingsley* to a denial of medical care claim for the reasons explained above. Contrary to Plaintiff's assertions, the standard governing the due process claims of pretrial detainees need not be uniform across all types of claims, especially considering the absence of clear guidance from the Supreme Court.

Plaintiff notes that the Second, Fourth, Sixth, Seventh, and Ninth Circuits have applied *Kingsley* outside of the excessive force context. Similar to the arguments made by Plaintiff in her brief, App. Br. 31-33, these courts have

advanced an expansive interpretation of *Kingsley* that is unsupported by the text and reasoning of that decision. These courts have also placed undue emphasis on the single phrase "challenged governmental action" and *Kingsley*'s citation to *Bell*.

### 2. The "should have known" standard from *Short v. Hartman* would collapse deliberate indifference into negligence in the context of this case.

Plaintiff gives particular focus to the Fourth Circuit's decision in *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), and urges this Court, App. Br. 4. to adopt the standard from that case, which only requires the plaintiff to prove that the defendant "should have known of that condition and that risk, and acted accordingly."[4] But applying *Short*'s "should have known" standard to this case would be a grievous error, for two reasons. First, as a factual matter, *Short* was a failure to prevent suicide case in which the defendant officers had actual notice of

---

[4] The "should have known" standard from *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), is just one of many tests developed by the circuit courts that have extended *Kingsley* outside of the excessive force context. One court has even remarked that the circuit courts are "all over the map" in formulating a standard to replace the older deliberate indifference test. *Trozzi v. Lake County, Ohio*, 29 F.4th 745, 754 (6th Cir. 2022). Taking seriously *Kingsley*'s admonition that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," 576 U.S. at 396, some courts have fashioned a standard of reckless disregard. For instance, in *Brawner v. Scott County*, 14 F.4th 585, 597 (6th Cir. 2021), the Sixth Circuit set forth a multi-prong test that required the plaintiff to prove that the defendant either "acted intentionally to ignore [the detainee's] serious medical need, or . . . *recklessly* failed to act reasonably to mitigate the risk the serious medical need posed to [the detainee], even though a reasonable official in [the defendant's] position would have known that the serious medical need posed an excessive risk to [the detainee's] health or safety."

the decedent's suicidal tendencies. When the decedent in *Short* was taken into police custody, she told police that she was having withdrawals from injecting Xanax the previous day, and that she was suicidal and had attempted suicide the previous month. *Id.* at 599. The decedent was placed in an isolation cell because, in the words of a supervising officer, she was being "mouthy." *Id.* at 601. More than twenty-four hours after being placed in the isolation cell, the decedent was discovered hanging from a bedsheet. *Id.*

Second, as a legal matter, *Short*'s "should have known" standard is explicitly a negligence standard that was adapted for failure to prevent suicide claims. In setting forth the "should have known" standard, *Short*, 87 F.4th at 606, cited an earlier Fourth Circuit case, *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992), which in turn cited a First Circuit case, *Elliott v. Cheshire County*, 940 F.2d 7, 10-11 (1st Cir. 1991). In *Elliott*, the First Circuit explained that although "[d]eliberate indifference is more than negligence," when "a supervisory official is placed on actual notice of a prisoner's need for physical protection or medical care, administrative negligence can rise to the level of deliberate indifference to or reckless disregard for that prisoner's safety." 940 F.2d at 10 (internal citations omitted). This Court observed that the "key to deliberate indifference in *a prison suicide case* is whether the defendants knew, or reasonably should have known, of the *detainee's suicidal tendencies*." *Id.* at 10-11 (emphasis added). In practice this

means receiving actual notice of the suicidal tendencies because "[i]n the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference." *See id.* at 11 (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1273 (11th Cir. 1989)).

Plaintiff's promotion of *Short*'s "should have known" standard is a further step on the path to constitutionalizing negligence claims. After arguing that *Kingsley* eliminated the subjective intent element for *all* claims raised by pretrial detainees, Plaintiff then asks this Court to adopt the standard from a failure to prevent suicide case–which is explicitly a negligence standard–as the general replacement for the two-pronged deliberate indifference test. While a standard asking whether the defendant officers "should have known of that condition and that risk" may be appropriate to determine whether officers had actual notice that a detainee had suicidal tendencies, it is inappropriate in the factual context of this case, in which the detainee concealed his drug use from the defendant officers, thereby leading to an acute medical emergency.

## II. Even if *Miranda-Rivera* did not rule on the applicability of *Kingsley* to denial of medical care claims, the defendant officers are entitled to qualified immunity.

Regardless of whether *Miranda-Rivera* constitutes binding precedent, the defendant officers may not be retried under an objective-only standard. Rather, the

defendant officers are entitled to qualified immunity because they won a verdict under the two-pronged deliberate indifference standard and the plaintiff cannot meet her burden of showing that the objective-only standard was clearly established at the time of Stilphen's death in July 2019.

The Supreme Court has provided "government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The qualified immunity doctrine "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The qualified immunity analysis is two-pronged: the court must determine: (1) "whether the defendant violated the plaintiff's constitutional rights"; and (2) "whether the allegedly abridged right was 'clearly established' at the time of the defendant's claimed misconduct." *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018) (citing *McKenney v. Mangino*, 873 F.3d 75, 81 (1st Cir. 2017)). "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (internal quotations omitted).

This Court should follow the example of the Sixth Circuit in *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919 (6th Cir. 2024), which concerned a claim that jail officials failed to prevent the decedent's suicide in 2018. The Sixth Circuit noted that in the years following the Supreme Court's decision in *Kingsley*, there was a circuit split about whether the objective-only test applied to Due Process claims outside the excessive force context. *Id.* at 927. Eventually, *Lawler* noted, the Sixth Circuit did extend *Kingsley* to apply to claims of failure to protect the pretrial detainee from harm. *Id.* (citing *Brawner v. Scott County*, 14 F.4th 585, 591-97 (6th Cir. 2021) and *Helphenstine v. Lewis County*, 60 F.4th 305, 316 (6th Cir. 2023)). At the same time, because these cases, which were decided between 2021 and 2023, postdated the plaintiff's suicide in 2018, they "do not clearly establish anything 'at the time' the Officers acted." *Id.* (quoting *Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 694 (6th Cir. 2022)). Nor did *Kingsley* clearly apply to pretrial detainees' failure to protect claims, as evidenced by the circuit split. *Id.* The Sixth Circuit thus applied the older, two-pronged deliberate indifference test from *Farmer* to determine the officers' liability. *Id.* at 928.

This case is on all fours with *Lawler*, with the notable difference being that, unlike the Sixth Circuit, the First Circuit expressly discussed *Kingsley* and declined to extend it outside the excessive force context in *Miranda-Rivera* and then again analyzed a denial of medical care claim under the two-pronged deliberate

49

indifference standard in *Zingg*. Rather than being not clearly established, the law in the First Circuit in July 2019 was clearly established that the two-pronged deliberate indifference standard governed pretrial detainees' denial of medical care claims. Even if this reading of *Miranda-Rivera* is incorrect, however, the notion that an objective-only standard would govern a denial of medical care was at best (from Plaintiff's perspective) not clearly established in the First Circuit in July 2019. The First Circuit's decisions applying the *Farmer* standard to denial of medical care claims raised by pretrial detainees provide the only clearly established law at that time. The defendant officers won a jury verdict under the two-pronged deliberate indifference standard. Qualified immunity bars their retrial under an objective-only standard. *See Lawler*, 93 F.4th at 919.

## III.   The District Court's instructions were not prejudicial to Plaintiff's claims against at least two of the defendant officers.

Plaintiff argues that she was prejudiced by the District Court's instructing the jury under the two-pronged deliberate indifference standard. But any argument about prejudice must grapple with the District Court's statement that it would almost certainly grant a judgment notwithstanding the verdict for Officer Freire and Bertocchi, and perhaps even Officer Picarello. Appx1092. In observing that Officer Freire and Officer Bertocchi "were gone before . . . anything would have alerted them to any . . . serious medical need that required their intervention"

(Appx1092), the District Court was essentially ruling that Plaintiff had failed to meet her burden with respect to the objective or "serious medical need" prong of the two-pronged deliberate indifference test against those two officers. *See Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990) (defining a serious medical need as "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"). Where she would have failed to prove her claims against Officer Freire and Officer Bertocchi anyway, the inclusion of the subjective prong did not cause her prejudice.

**A. Officer Freire and Officer Bertocchi.**

The District Court correctly noted that Plaintiff failed to prove the objective prong with respect to Officer Freire and Officer Bertocchi. Here the District Court was relying on the surveillance video footage as well as the testimony of Plaintiff's medical expert, Dr. Ross MacDonald, who stated that prior to 4:48 AM, Stilphen was not experiencing an overdose and the appropriate form of medical treatment that he required was monitoring. Appx478, 490; Appx1228 (Ex. 5e at 18:24-18:40). Officer Freire and Officer Bertocchi last interacted with Stilphen at approximately 2:23 AM and 2:32 AM, respectively–well before Stilphen began to overdose and even before Stilphen started ingesting the drugs that he had secretly brought into the police station. Appx683; Appx774; Appx1225(Ex. 2a at 01:15-

02:13); Appx1228 (Ex. 5a at 11:46 - 11:54). Echoing the testimony of Plaintiff's medical expert, Officer Freire and Officer Bertocchi testified that they were confident Stilphen was not facing a serious medical need when he was in their presence because he was coherent, moving, and responsive to stimuli. Appx677, 681; Appx761-762, 775.

As evidence that the behavior of Officer Freire and Officer Bertocchi toward Stilphen was "objectively unreasonable," Plaintiff cites the testimony of her police practices expert, Michael Lyman. Mr. Lyman testified that a "reasonable officer" in the position of Officer Freire or Officer Bertocchi would not have left Stilphen in his cell without taking further action. Appx576-577; Appx579-581. But there are major problems with Mr. Lyman's testimony. First, Mr. Lyman's testimony is at odds with the opinion of Plaintiff's medical expert, Dr. Ross MacDonald, who testified that prior to 4:48 AM, Stilphen was not experiencing an overdose and the appropriate form of medical treatment that he required was monitoring. Appx478, 490. By stating that it would almost certainly grant judgment in favor of Officer Freire and Officer Bertocchi, the District Court was signaling its agreement with Dr. MacDonald. Second, the reliance on Mr. Lyman's testimony, which repeatedly posited what a "reasonable officer" would do, is another instance of Plaintiff's attempt to lower the constitutional standard to encompass negligence. *See*, *e.g.*, *Boston, C.C. & N.Y. Canal Co. v. Seaboard Transp. Co.*, 270 F. 525, 529 (1st Cir.

1921) ("Negligence is failure to conform to the standard of the reasonably prudent man."). Where the issue is the defendant officers' lack of attention when making a medical assessment, rather than the appropriateness of an intentional use of force, the reasonableness inquiry cannot but collapse into a negligence test. Third, Mr. Lyman's testimony does nothing to address Plaintiff's failure to prove the causation element of the claims against Officer Freire and Officer Bertocchi given Stilphen's intervening fentanyl consumption after they last saw him.

## B. Officer Picarello.

In response to Defendants' motion for a directed verdict at the close of Plaintiff's case, the District Court stated not only that it would grant such a motion from Officer Freire and Officer Bertocchi, but also that it was open to such a motion from Officer Picarello. Appx1092. It is no exaggeration to say that Officer Picarello's liability rests on one or at most two cell checks he conducted. Specifically, at around 5:39 AM, Officer Picarello dropped off food at Stilphen's cell. Appx1225 (Ex. 2g at 9:10-9:23).

Plaintiff failed to meet her burden with respect to the objective prong against Officer Picarello. Prior to that morning, Officer Picarello had never worked as a booking officer. Appx785. As it so happened, his first shift at the booking desk saw not one but two prisoner deaths in the police station. Appx823. Based on Officer Picarello's limited observation, it was not obvious that Stilphen was

suffering an overdose rather than sleeping, as he had been doing throughout the morning.

### C. Officer Almeida.

Although Officer Almeida was the booking officer who conducted most of the cell checks between 4:48 AM and 5:51 AM, Plaintiff's case against him under an objective-only test is not clear-cut. First, although Stilphen was in an unusual bent-forward position during that time period, Officer Almeida had seen him in that position throughout the morning. Appx1225 (Ex. 2a - 2g); Appx1228 (Ex. 5a - 5e). Second, Stilphen's overdose took place against the backdrop of a uniquely hectic morning. After Joseph Perry suffered a fatal injury in the wagon bay, the entire D-4 station was transformed into an active crime scene. Appx875; Appx931-932. Officer Almeida testified that it was the busiest night of his career. Appx857.

## <u>CONCLUSION</u>

The District Court properly applied the two-pronged deliberate indifference standard to Plaintiff's denial of medical care claims. This Court should affirm the judgments in favor of the four defendant officers.

Date: August 29, 2025                    Respectfully submitted,

**ISMAEL ALMEIDA, PAULMICHAEL BERTOCCHI, CATIA FREIRE, AND BRIAN PICARELLO**

By their attorneys,

ADAM N. CEDERBAUM
Corporation Counsel

*/s/ Randall F. Maas*
_____

Edward F. Whitesell, Jr.
First Circuit Bar No. 1122127
Senior Assistant Corporation Counsel
Randall F. Maas
First Circuit Bar No. 1204232
Senior Assistant Corporation Counsel

City of Boston Law Department
One City Hall Plaza, Room 615
Boston, MA 02201
(617) 635-4034
edward.whitesell@boston.gov
randall.maas@boston.gov

55

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Randall F. Maas, certify pursuant to Fed. R. App. P. 32(g) that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because the entire document contains 12,975 words, as verified by the word count function of Microsoft Word, the word-processing system used to prepare this brief. I further certify that this document complies with the typeface requirements of Fed. R. App, P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word using 14-point Times New Roman font, a proportionally-spaced typeface.

Dated: August 29, 2025

*/s/ Randall F. Maas*

_____

Randall F. Maas

## **<u>CERTIFICATE OF SERVICE</u>**

I, Randall F. Maas, certify that on August 29, 2025, a true and accurate copy

of the foregoing document was electronically filed with the United States Court of

Appeals for the First Circuit by using the CM/ECF system and that all counsel of

record will be served by the CM/ECF system.


*/s/ Randall F. Maas*

_____

Randall F. Maas